Case No. 16 at 5327 and L. Stand Up For California! at L. Appellants, Pekingun Rancheria of the Chuchansi Indians, a federally protected Indian tribe, versus United States Department of the Interior at L. Mr. Sherlock for Appellants, Stand Up For California! at L. Mr. Robinson, Appellant Pekingun Rancheria of the Chuchansi Indians. Mr. Toth for the Appellees and Mr. Waxman for the Intervenor. Mr. Waxman for the Intervenor. Thank you. Yeah, if they could do it swiftly, please. Okay. As the Court is probably aware, the Secretary in this case concluded that this applicant tribe was under federal jurisdiction in 1934, but solely on the basis that there was an election held under Section 18 of the Indian Reorganization Act for this tribe. And we have argued and pointed out that the Section 18 election standing alone cannot be evidence of a tribe being under federal jurisdiction in 1934, because it's not even evidence of the existence of a tribe. The District Court, of course, disagreed with us, and it cited Section 19 of the Act and Section 19's definition of tribe as including the Indians residing on one reservation. And based on that definition, the District Court concluded that the six Indians who were given ballots to vote in the Section 18 election at the North Fork Rancheria in 1935 were, per se, a tribe. And we submit that that conclusion, that interpretation of the statute, while it may be convenient for this tribe in this particular case, that it could lead to absurd results and create a bad precedent. And primarily we owe some deference to the agency in its interpretation of that statute, don't we? Well, I don't think so. Why not? Because the agency actually didn't make that interpretation in this case. The agency, in the record of decision, does not conclude that the Indians residing on one reservation are a tribe. And even here on this appeal, the agency has not advanced that argument, despite the District Court's reliance on that argument. And we have pointed out that the language of Section 18, the plain language of Section 18, makes it clear that a Section 18 election is not for tribes. It is an election for adult Indians at reservations, and it specifically omits any mention of tribes. And there are two main points that I'd like to make this morning on this issue. First is when we look at the solicitor's memos from 1934, it is clear that the government at that time, in 1934, understood the Section 19 definition of tribe as including the Indians residing on one reservation, to mean that all of the Indians residing on one reservation could organize as a tribe if they chose to do so. And this is entirely consistent, of course, with Congressional policy of tribal choice and autonomy. Whether a tribe chooses to exist or to organize as a tribe is purely a matter of tribal choice and autonomy. And the only way to harmonize the definition of tribe in Section 19 with that Congressional policy... defines a tribe as any tribe, etc., etc., or the Indians residing on a reservation. Yes. The definition is any Indian tribe, organized band, Pueblo, or the Indians residing on one reservation. Or the Indians residing on one reservation. So I don't understand why the district court wasn't correct. I still don't get that. Well, because the district court used that definition to interpret the statute to mean that, per se, the Indians residing on one reservation must be a tribe. Isn't that what it says? It does say that. They use the definition to interpret the statute. The definition is the statute. But in order to reconcile that with the purpose of the Act and to discern Congressional intent, which is ultimately... I thought we had some very strong language from the Supreme Court that we are supposed to look at the text and look at policy and other matters only if the text is at least somewhat ambiguous. This doesn't seem ambiguous at all, unless you can tell me why it's ambiguous. The term tribe, whenever used in this Act, shall be construed to refer to...the Indians residing on one reservation. That was to Tatel's point. What's ambiguous about that? Well, there are multiple different categories there. And it may very well be that the tribe...a tribe could, we know from the historical record, occupy more than one reservation. Tribes could...there were multiple tribes occupying a single reservation at the time. We have this historical evidence in the way of, for example, the Quinault Reservation. Does that mean Congress was just wrong? Well, no, I think that the intent that Congress had, as indicated in the solicitor's memos at the time the Act was passed, and again to try to reconcile this with Congressional policy, the policy of the IRA to preserve tribal choice and autonomy... Do you have another argument on this point? No, only that there's no evidence in the record, of course, that the seven or six Indians at the North Fork Rancheria in 1934 had chosen in any way to organize or identify themselves as a tribe, per se. Is there any evidence that those Indians were on more than one reservation? No, there is not. I thought maybe you were going to make the argument, well, one reading of the exact words here is that if they're residing on more than one reservation, they're not a tribe, but you don't have any evidence to suggest that's the circumstance in this case. No, the evidence in this case, and that brings me to another point, but the evidence in this case indicates that the rancheria was purchased for the Indians in the vicinity, or in the geographical term, and that these Indians had varying tribal affiliations in the past, and not that this applicant tribe existed at that time. And so the evidence here overall is far from clear as to whether or not there was a tribe in existence at that time, and certainly far from clear whether it was this applicant tribe. And nevertheless, the district court endeavored to interpret that evidence and relied on certain historical documents to reach the conclusion that this tribe was under federal jurisdiction at that time. And as we've said, considering that the secretary is the one who possesses expertise in matters of tribal recognition and history, it was error for the district court to interpret the historical record, the historical documents, when the secretary specifically chose not to interpret that historical information and instead to rely solely on the conduct of the Section 18 election. Can I ask you, if the reading were the one that Judge Taylor and I are suggesting, of course we haven't made that decision, but if that were the reading, under those circumstances, then, would the fact that there was an election be sufficient to say that they're under jurisdiction? It would be sufficient, I believe, to say that a tribe was under jurisdiction. If the court reaches a conclusion that the Section 18 election is evidence of a tribe, which, again, we dispute, then, yes, the Section 18 election, I would concede, would be evidence of that tribe being under jurisdiction. Even though the election itself takes place in 1935? I think that's fair. We're not making an argument over that. And that, I take it, is because of the now word in the statute. Yes, the now being at the time the law was enacted, and the Section 18 election being an action taken in furtherance of the enactment of the law, yes. And the requirement that it be within one year. Yes, yes. Even if the court does determine that the Section 18 election was evidence of a tribe, we still have the problem of, was it this applicant tribe? There is still a gap in the record there. And the district court erred there again in essentially relying entirely on the Tilley-Hardwick decision, or I should say the Tilley-Hardwick stipulated judgment, which was entered in 1983. Wait, wait. Let me take you back. In 1958, right, the government ended its trust relationship with the North Fork tribe, right? No, that is not correct. Oh, it's not? In 1958, Congress passed the Rancheria Termination Act. But that act does not terminate the government's relation with tribes. It terminates the government's relation with rancherias and with the individual Indians who were distributees of the rancheria land. That can be found in Sections 10 and 11 of the Rancheria Act. But it did not terminate relationships with tribes. And so what we have in the record with this Tilley-Hardwick stipulation, or stipulated judgment, is it's got two components to it. In one component. Excuse me, but it does, under that, it does recognize the North Fork tribe, right? Yes. There are two components of the Tilley-Hardwick judgment. One says that the plaintiffs, the named plaintiffs, which includes the North Fork tribe, shall be restored to the same status that they possessed prior to the termination. That still begs the question, well, what was that status? And we know from the government's federal record or federal register notice that there was no notice of a termination of a North Fork tribe. There was simply the notice that the rancheria was going to be distributed to its sole occupant, Mrs. Susan Johnson, and I believe also her two adult sons. But there was no mention of a tribe. In fact, it expressly states that these people, Mrs. Johnson and her two sons, were not members of any tribe. And so it still begs the question, well, what was the North Fork rancheria status prior to the termination? The second part of the Tilley-Hardwick judgment, that's the part that says, and these plaintiffs shall be recognized as tribal entities and listed on the Secretary's list of tribal entities, that is a provision by which this applicant tribe gained recognition. With the same status that they previously had, right?  I'm referring to Section 4 of the stipulation. And the second portion that I'm referring to says, said tribes, bands, communities, and groups shall be included on the Bureau of Indian Affairs Federal Register list of recognized tribal entities pursuant to 25 CFR Section 83.6. As an Indian entity with the same status as it possessed prior. Yes, that is the first portion of Paragraph 4 that I was referring to. Right. So in that, the first portion says the Secretary... Doesn't that say what the Interior Department, doesn't that say what the Secretary says it says? That it restored it as a North Fork tribe? I don't believe the first part of that sentence actually is the portion by which North Fork Rancheria gained recognition. All that section says is whoever was terminated under the Rancheria Act shall be restored to that same status. But it's the second part of the sentence following the word and, by which the tribes, bands, communities, et cetera, and this applicant tribe in particular gained federal recognition. Okay. The Federal Register list of recognized tribal entities, is that the same thing as tribes or not? The current list, I believe so. What about in the year of the Hardwick stipulation? It confused me a little bit as it said that the tribes, bands, communities, groups, so that Rancheria is listed in Paragraph 1, which included North Fork, shall be included on the Federal Register list of recognized tribal entities. Yes. Well, it uses a term in the pair of tribes, bands, communities, or groups. Yeah. So it's not necessarily acknowledging that all of these entities listed in Paragraph 1 were tribes. They could have been communities. They could have been groups. What happened when they were listed? How were they listed? How was North Fork listed? When North Fork, I don't know, or I'm afraid I can't really answer how they were listed. You mean in 1984 pursuant to the stipulation? Yeah. I don't recall what the listing is, whether it just says North Fork or North Fork Rancheria of Mono Indians. I believe currently, for what that's worth, it lists them as North Fork Rancheria of Mono Indians. As a tribe? Yes, certainly. Certainly coming out of this Tilly Hardwick stipulation, there was a tribe. Okay. I have one more question for you. Some of your opposing counsel also refer to the land appropriation in 1913, and that act, which was for the benefit of some of these Indians. I appreciate your argument that that's not the grounds for the decision, although it's listed as the next paragraph. What if it were the grounds for the decision? Well, again, I don't think it would be a valid ground for the decision because the 1913 act merely appropriated money for the secretary to acquire land for California Indians generally, and certainly not for this applicant tribe specifically. There's no question about it that Congress wanted to acquire these rancherias to provide land because at the time, the state of California Indians was, well, not very good, to put it mildly. Okay. Further questions? No, I'm done. Thank you. Thank you. Mr. Robbins. May it please the Court, Michael Robinson on behalf of the Pecun Rancheria of the Tuchansi Indians. In my comments, I would like to focus on primarily one issue, and that is the gaming eligibility determination for the Madera site. And from our perspective, there's one line in the secretary's opposition brief that sums up the problem and the issue here. And that's when the secretary says, we don't know whether or not the outcome of the secretary's decision would be different if he fully contemplated the impacts on the Tuchansi tribe. And it's obviously our position that the Indian Gaming Regulatory Act requires him to do just that. Authorized irrigation gaming exception under IGRA is the most extreme, is potentially the most impactful, definitely has the most potential impact on other gaming tribes that are gaming on their reservations. That's why there is the requirement to analyze the detriment. But the statute says surrounding community, and the regulation defines surrounding community as 25 miles, and your client's more than 25 miles away. That's correct, Your Honor. It does define the surrounding community that way, but it does include an exception to that. And it includes an exception for tribes or local communities that can show that they'll suffer significant impacts by the gaming facility. But the secretary here has concluded that you haven't shown that. Well, no, the secretary concluded that we did show it. The secretary, in his record of decision, admitted that under the facts and because of the impacts and because of the proximity to Picune was from the proposed site, that he felt compelled to consult with Picune and to consider the impact. And he considered it, and he considered the benefit outweighed that. That was his conclusion. Well, he did conclude that. The problem is that conclusion isn't based on any evidence in the record. He concluded that by saying, I believe that the benefits outweigh it, and therefore the benefits outweigh it. Well, he found specifically with regard to the Picune tribe that it would suffer at least a 19% loss in revenues. And then he said, I'm discounting those impacts. I'm discounting the comments by Picune because of their distance from the proposed site. Well, that distance is, when you take that approach to it, what you're doing is you're requiring a tribe to show the hypothetical impacts if they were closer. As we argue in our papers, the impacts that he recognized Picune will suffer, Picune will suffer. And when the department was explaining the basis for its rule in the 25-mile radius, what they made clear was that 25-mile radius rule was intended to be flexible because what they recognized was that the determination of all the detrimental impacts was the more important inquiry. It was more important than the 25 miles. And when you're talking about other tribes that are gaining on the reservation and remote areas. You're arguing a subject that we look at in about as deferential a way as a court can. We're looking at the agency's interpretation of its own regulation, and it's a question of whether evidence supported that. And so, you know, you have sort of a double problem here. So looking at it that way, that is from the way we look at it, what's your straw? You're not arguing they violated their own regulation. You're arguing basically there wasn't sufficient evidence to support the ultimate judgment the secretary made, right? Well, we're arguing that they violated the intent of IGRA. And how did they do that? So are you arguing the regulation is invalid, that the 25-mile rule is invalid? We're not arguing that the 25-mile rule is invalid. We're arguing that the 25-mile rule by its own definition is flexible. That's my point. The secretary has interpreted it differently than you have. But in the 25-mile rule, there is a specific provision that allows for other communities to participate in the consultation process. And it did that. The secretary did that. And he did do that, but then he didn't tell us what weight he was giving those comments, if any. He didn't tell us if those. Less weight than if you had been within the 25 miles. That's exactly what he said. And the problem for us is that. . . Isn't that sort of a logical conclusion from the way the rate. . . I mean, you could certainly interpret the regulation the way you have. That is, once the secretary looks beyond 25 miles, he has to give it equal weight to everything else. But the secretary didn't interpret it that way. Well, I don't see how you can. . . That defeats the entire purpose of the consultation process because the consultation. . . That would have happened if they had refused to consider the impact on your client, but it didn't. It's standardless, though, Your Honor. He didn't tell us what standard he was using. He didn't give us any information about how he was considering the weight of the unit or if he gave it any weight whatsoever. What he did say in his record of decision is that if it is shown that a tribe with on-reservation gaming will suffer detrimental impacts from an off-reservation proposal, the off-reservation proposal will not be approved. He found specifically that the Kuhn would suffer, that your chance of tribe would suffer detrimental impacts of a minimum of a 19% loss in revenues. He found that they were going to suffer significant impacts to include them in the consultation process. But he said there were counterbalancing. They said there were counterbalancing positive effects. So the answer to your question is, you don't know what standard. If they had found no counterbalancing positive effects, you would have won. So he has given us thought. They have given us a standard. It's not going to be as precise as you would like because it's impossible. They said there were significant counterbalancing positive effects. You don't like what they're weighing, but nonetheless, the question is, is there something wrong with what they weighed against what you're pointing to? They considered the negative effects that you pointed to, and they said they're counterbalancing positive effects. And we're weighing those, and in our mind, they're sufficiently happy, and that's that. They did that, Your Honor, exactly. But they did it with giving lesser weight. We don't know what weight. And there's nothing in the regulations, there's nothing in the Indian Game and Regulatory Act that says that the Secretary can grant or take. Is there anything in the act or the regulation appropriated to the Secretary from doing what it did? The intention of IGRA. No, but what? What in the statute? Pardon me? The statute says nearby community, right? IGRA expresses an... Doesn't it say that? Yes, it does. Surrounding community. Sorry, it says surrounding community, right? It does say surrounding community. So Congress has adopted this standard, surrounding community, and the agency's defined it. And I just... So I go back to my question, what in the statute prohibits the Secretary from doing what it did here? I think when you're dealing with another Indian tribe... Because that's the argument. You have to be able to come up with an answer to that to win. Could you repeat the question for me? I apologize. Yeah, the question is what in the statute or the regulation prohibits the Secretary from doing what it did? Well, I think to get to that, we have to look at the intent of IGRA and its intention to protect all tribes. Well, no, it says surrounding community. It does say surrounding community. That has to have some meaning. But so do the exceptions. The exceptions that allow a tribe to become part of the surrounding community if they show... Can I ask you about that? So this is where I hate being such a stickler here on the text. But since I did it in the last case, I'll do it in this case. So the text of the statute says surrounding community, as Judge Tatel said. And the regulation says surrounding community is 25 miles, and you're not in it. So if that were the end, you would be done, right? Correct. Then it does not go on and say we're making an exception to the meaning of surrounding community, which is the way you're reading the regulation. It just says that a local government or Indian tribe beyond the 25-mile radius can petition for consultation. It doesn't say that makes them a part of the surrounding community. It just says they can petition for consultation. Included among the others who are consulted are the governor, who as far as I know is not within 25 miles and is not part of the surrounding community, state officials who are also not part of the surrounding community. So they get to consult, but they don't get to be considered part of the surrounding community. So why do you keep referring to this as an exception to the definition of surrounding community rather than, as it says, to an exception that allows consultation for people who are not in the surrounding community? When you look at the explanation and the purpose that the secretary attached to that 25-mile radius rule, the reason I'm saying it's an exception to the surrounding communities is because what they said in specifics with regard to the 25-mile radius rule is that it was intended to be flexible. The surrounding community definition was intended to be flexible so that they could determine all of the detrimental impacts. Which they did. Pardon me? It's exactly what the secretary did. I'm sorry? It's exactly what the secretary did. It took account of all the impacts and balanced them against each other. It's very hard without giving us something in the statute or regulation you're violating to find a basis for us upsetting that judgment. I appreciate that. I haven't heard it from you yet, and I didn't see it in your briefs. Well, I think how we tried to explain it in the brief was that, again, when you're dealing with another Indian tribe, and I apologize for coming back to this, but I think it's of critical importance. When you're dealing with another Indian tribe in the local area, those impacts are even more important. I mean, the Pikun tribe, it's the Chukansi tribe. Its only economic engine is that casino that it has. It's all it has. The secretary owes responsibility to them as well as to North Fork and all the other tribes. And so when they've shown the significant impacts that would include them in the consultation, it's more important because of the secretary's duty to all the tribes, it's more important at that point for the secretary to take a hard look at the impacts, consider them at full weight, and then make a decision on whether or not we'll approve the reservation gaming project. That's certainly one view of the way it could be run. It's just not the one the secretary operates, that's all. Yeah. Any further questions from the bench? No. Thank you. All right. We'll hear from Mr. Toth. Good morning, Your Honors. Brian Toth from the Department of Justice representing the federal appellees. I'd like to start with the Indian Reorganization Act. I'd first like to dispute this characterization of the record of decision as relying exclusively on the Section 18 election as evidence that the tribe was under federal jurisdiction in 1935. If you look at the sentence of the rod itself, it says, it refers to the fact that an election was conducted at the tribe's reservation. This is on page, Joint Appendix 4095. And then in the next paragraph, as the Chief Judge mentioned, it talks about the purchase of that reservation, also known as the Rancheria. And as the district court found, that Rancheria was purchased not for a group of disaggregated Indians, but for the use of the North Fork Band of landless Indians. That's by relying on the Turrell letters. That's right. The Turrell letters are best evidence of that. It's also quoted in the application package to the Bureau of Indian Affairs, J527 and J4032 and 534. How do you get to this Part D, which is about the need of the individual Indian or tribe for additional land, and Part C, which is the termination that they're under the jurisdiction? So I think you have to understand this in the context of reviewing the whole record. In the Confederated Tribes of Grand Ronde case, the court reviewed this question under an arbitrary and capricious or reasonable standard of the APA and specifically referenced the whole record. And so you have in the record evidence of the purchase order, the quoting of the purchase order. You mean you think that we held there that regardless of the rule of the Chenery case, we should look over the entire record and find anything that would support the agency, even if the agency did not rely on it? Well, I think the agency did indirectly rely on it here by referring to the tribe's reservation in that key sentence on 4095. But even if you, you know, even consistent with general APA practice, so long as the agency's path of reasoning can reasonably be discerned, that satisfies the state formula. I was trying to see whether I can discern that path here. No, I understand. I mean, it would be nice. Ideally, we would have a deed from 1913 and thereabouts. I don't know. Ideally, it wouldn't be Section D. Ideally, this would be part of Section C. I understand. And I would understand that it's part of your rationality agency. No, I understand. You slid into that argument like we wouldn't notice. I was trying not to laugh. I'm sorry. The band, you know, it's important because band is a term that's defined in the statute as an Indian tribe. And I think it's not disputed. You heard from my friend for stand-up that today, and as of the Hardwick stipulation, this tribe that is before the court as an intervener, the North Fork, is fully recognized as a federal Indian tribe. And we also have, by virtue of it being called a band, a North Fork band of landless Indians, for which this Terrell. Go back to the question. Do you think we can legitimately rely on the rationale of the land purchase, given the decision that's before us for a deed? That's what the Chief Judge essentially asked. We're all looking at it. It doesn't look like it's really connected to the justification. And you tried to slide by it. I guess I would have maybe done it the same way. But it doesn't appear the way you were suggesting. It's not powerfully a part of the Secretary's rationale. It's not powerfully part of it, granted. It's implied by the tribes, the reference to the tribes' reservation. Do we have to rely on that? No, I don't think so. I think you can rely solely on the election. On the election, exactly. And that's, Judge Cato, what you said is that U.S. is that determination due deference. It is. Grant Rahn found that rationale in the solicitation, which was formalized. It was in the record of decision of that case, which came before this case. It talks about an extensive analysis under federal jurisdiction. And there's a footnote in that that says if there was an election called for under Section 18, it doesn't matter the result, that that itself is an assertion of federal jurisdiction by the Secretary contemporaneous with the statute. Let's say that we didn't think we could rely only on the election. Are you saying that if we were to remand it to the agency to tell us whether it also rested on the appropriations, it would just come back to us and say rested on the appropriations also? I think that's true. I mean, I'm not the agency decision-maker, but I think that's very likely. I think that a remand would be a waste of time, would be futile in that regard. And I think there's sufficient evidence in the record as a whole to support the Secretary's conclusion. Traditionally, this inquiry has focused on the assertion of federal authority, and there's really no dispute that federal authority was asserted over the group that was present on the reservation in 35. The question that standup raises is whether this was the same tribe that's before the court today. But there's no judicial decision that I'm aware of that they cite that authorizes the court to make that type of inquiry into how the tribe's membership has fluctuated over time and to basically trace the lineage of the membership. By virtue of the fact that the tribe is on the list today, the List Act of 1994 says that that is a valid recognition that cannot be terminated except by Congress. And we have the Hardwick stipulation referencing not just individual Indians, but the band of the Rancheria that was fully recognized as having been unlawfully terminated a person to the Rancheria Act. So really, there's a continuity there through the Hardwick stipulation that really defeats my friend's argument on the other side. Thank you. Thanks. Mr. Waxman. Mr. Chief Judge, and may it please the Court, I just want to state for the record that I am most willing to be run over by your honor for these purposes. I don't know what you're asking for here. Let me make a few points with respect to the Section 18 argument, or as I will say, the IRA argument. That is the under-federal jurisdiction argument. And then, you know, one point with respect to the detrimental effects determination with respect to PU. First of all, on the question of whether the Section 18 election alone establishes that a tribe was under federal jurisdiction, the Secretary of the Interior has, without exception, consistently taken that position and explained that position in the 2014 solicitor's memo. The first three times that the Department took that position, four of them before the decision in this case, the record cites one of them, a 2011 decision involving the Shawano County. But there also were, and I'll just give you the cites, there was a 24 IBIA 33 at 42. That's for the Auburn Band, for the Cowlitz Band, which was the band that was at issue in your Confederated Tribes. The Secretary said that on page 95, note 98. And for the Enterprise Rancheria, the Secretary also said it in his record of determination at page 44 a couple of weeks before this one. And that is a correct and accurate statement for the construction of under federal jurisdiction for the reasons stated at page 20 of the solicitor's 2014 memorandum. If it weren't enough, the question, as I think the Court's questions identify, is was there nonetheless, did the Secretary nonetheless determine that this was an election of members of a tribe, members of a band? And Mr. Toth pointed to the Secretary's determination on page 4095 that the election was held by the adult Indians residing at the tribe's reservation. Now, I understand the Court's questions about, well, is that really a finding, that the reservation had been purchased for the benefit of the band? Mr. Sherlock says there's no evidence in the record that this band for whom, or these Indians for whom this land was purchased in 1916 was in fact a band. And I want to make sure that in evaluating that, the Court has in front of it what I believe are the very substantial findings and evidence made by and evidence before the Secretary. The IGRA rod, which the Secretary issued a year before, finds on page 3932 that the rancheria lands were purchased, quote, for the North Fork band of Indians. And that was supported by the very deed of trust, the very deed of purchase, which is referenced both in the BIA's decisional package in the record at page, Joint Appendix page 527, and in the tribe's... Could you say again the page of the IGRA rod that you're repeating? The IGRA rod is on page 3932. The BIA decisional package, what the BIA sent to the Secretary before he issued the IGRA rod and then the IRA rod, says that in, quote, and I'm quoting on page 527, but the discussion continues all the way to page 530, in 1916, the federal government purchased an 80-acre parcel of land in the town of North Fork, Madera County, California, for the, quote, use of the North Fork band of landless Indians. That was, and the citation is to a document which was also appended as Exhibit B to the tribe's application, and the reference there is on JA 4120. The actual document that it's referring to is available to the court at ECF 33-1, and it is the actual purchase order for this 80-acre parcel. And it specifically says, and I quote, this is for the purchase of, and it gives the meets and bounds, quote, for the use of the North Fork band of landless Indians. And then, of course, the Terrell report not only says at page 4020 that the purchase is for the more than 200 Indians properly belonging to the North Fork and vicinity band. On page 4019, it recites that Mr. Terrell is actually providing a census of those Indians to the tribe. Now, with respect to this tracing argument, the tribe's application, I'm 99% sure, included the tribe's constitution. The tribe's constitution requires that to be a member of the tribe, you have to demonstrate descendency from a North Fork band member listed in the government census. Chief Judge Garland, you made the point about Chenery, and we think that Chenery is implicated because it's, we think, overwhelmingly clear, both from the Secretary's determination in the IGRA rod and for all the other reasons that I've stated, which was the evidence in front of the Secretary, that when he said in the IRA rod that not just that an election was held, but an election was held at the tribe's reservation, he understood, as he had previously said, that this was a reservation for the North Fork band of Indians. But even if that weren't so clear, I think I point to this court's decision in association of bituminous contractors versus AFFL, which I believe, Mr. Chief Judge and Judge Tabor, you were on the panel, where the court explains that the Secretary's implicit reasoning may be spelled out in subsequent briefing where it is consistent with longstanding interior policy that reflects fair and considered judgment. And Judge Garland, as you also said in the Axo-Nobel SALT case from 2000— One of my favorites. I knew you would hold it here, so let me just quote the relevant language for the benefit of your colleagues. A court may defer to an agency's litigation position where it appeared simply to articulate an explanation of longstanding agency practice. And not to show favorites here, Judge Tatel, in your case, the association of civilian technicians— Yeah, that's a really good one. I'm struggling to find a— We have about 20 cases where you say, yeah. Unfortunately, I couldn't find— But go ahead and quote it. I want to hear the quote. In the brief— Quote, it is undisputed that the United States, quote, policy and practice is longstanding. And under the circumstances, the court considers counsel's explanation of the statutory basis for the denial of the full relief sought by the guardsmen to represent the United States' fair and considered judgment. In the short space of time between the close of briefings— Can I just ask you one more question? You said when he referred to the tribes' reservation in the IRA rod, he was referring to his previous statements. Are you talking about the IGRA rod? So in the IRA rod, the court said, the secretary said, this was under federal jurisdiction because all the Indians residing at the tribes' reservation— You said that was an implicit reference to something he had decided before? Oh, yes, in the IGRA rod. And was the IGRA rod dated before? Yes, it was the year before. So typically, the way that I believe uniformly, the secretary doesn't take land into trust until there is an IGRA determination that it would be eligible for gaming. And that, just to be very clear, that determination by the secretary in the IGRA rod was supported not only by the Terrell report, which was cited there, but also by all of the findings and recited documents in the BIA decisional package that the secretary had in front of him. Finally, with respect to the Picayune's point, whether or not this tribe was within the surrounding area, and we certainly agree that it plainly was not, and the secretary expressly in this case found that it was not a nearby tribe. It is not the case, as Mr. Robinson said, that the secretary simply made a determination without any analysis. The record contains both the relevant pages in the IGRA determination are on 3957 and 3958. And the secretary also, the secretary's decision had incorporated and referenced the final environmental impact statement. And at pages 680 to 684 and 712, the final environmental impact statement made a very detailed analysis, which the secretary adopted, finding that a 19%, which was conservative, a 19% loss in revenues, would A, was A, in the context in which the North Fork Rancheria would bring about a $90 million increase in gaming at Indian casinos in the general Madera-Fresno area, and that in this market, in a market of this sort, that even if there were a drop of 19%, it would not affect the Picayune tribe's ability to operate profitably. And therefore, that... Something can be detrimental by reducing your profits, Canda. Well, not as the secretary has determined it. The secretary found that the detriment would be the final environmental impact statement found that the detriment would be, quote, less than significant. And the secretary made clear, both in the secretary's regulations and in the preamble to the Section 292 regulations, that the issue in the case is not whether... that the secretary would not find detriment or cognizable detriment just from competitive harm between casinos or business operations. The very sentence of the regulation that Picayune keeps talking about, how a non-nearby tribe can petition, sets out the secretary's articulated standard for what detriment to an Indian tribe is. And it says the standard is, and I'm quoting from the definition of surrounding community, that the governmental functions, infrastructure, or services will be directly, immediately, and significantly impacted by the proposed gambling establishment. I'll just say what that's a cite to. That is a cite to 25 CFR Section 292.2. And the secretary found, quite to the contrary, that even the competitive impact on the Picayune tribe was not considered a detrimental impact because the Picayune would still be able to operate profitably and that there was no basis for a finding that the tribe's governmental functions and services would be impaired. Was there a question? No. Okay. Thank you, Mr. Weiss. Okay. Back to Mr. Sherlock. I'm not sure who ran over whom in the last discussion, but somebody did, so we're going to let you have some extra time, too. Thank you, Your Honor. Two minutes, please. Thank you. Very quickly, with regard to the IGRA rod, the rod that was done a year earlier, when the court reads the secretary's analysis of the historical information in that record of decision, you will see that the secretary referred not to a tribe in relation to the actions prior to 1934, rather to predecessors of the tribe and ancestors of the tribe. But there is no indication from that discussion of the existence of a tribe, per se. With regard to Mr. Waxman's reference to ---- Did you say what page you're referring to? That is ---- I'm afraid I don't have a page citation handy, but it is the discussion Mr. Waxman was referring to in the IGRA rod of the history of the tribe, and that discussion arose in the historical context of the tribe's historical connection to the land, which, of course, is a different inquiry than federal jurisdiction. He mentioned a couple of points in the record where it refers to the North Fork Band of Landless Indians. I would merely point out there that the definition of tribe in Section 19 refers to organized band, not merely a band. So if there was a reference in the documents to a band, it wasn't necessarily to an organized band. And there are many, many more references in the record to the North Fork Indians or Indians in the vicinity of North Fork in geographical terms. And what we're saying is this really called for the Secretary's expertise and analysis here on the issue of federal jurisdiction and whether there was a tribe, and that really wasn't done. Finally, Mr. Waxman made reference to page JA 527 from our record here. That is an excerpt from the draft record of decision on the IGRA decision, the trust decision, and that analysis that he read from was scrapped in the final record of decision, primarily because in that draft record of decision, the Secretary was relying on the fact that he thought there was a Section 16 election that had been held at the North Fork Rancheria. And it turned out, if the Court will see in the record at JA 4031, 4032, that counsel for the North Fork brought to the Secretary's decision or attention that, no, it wasn't a Section 16 election, which, of course, is an election for a tribe to organize. It was actually a Section 18 election. At that point, the Secretary revised the record of decision throughout the discussion that Mr. Waxman was referring to and concluded solely on the basis of the Section 18 election that the tribe was under federal jurisdiction. Okay. Thank you. Thank you. Did you have more? So, proportionally, we'll give you one minute, which is even more than your percentage. Thank you. I would just primarily like to point out that the section of the 25 CFR 292.2 that Mr. Waxman pointed the Court to that spells out the standard for determining detriment, that is the standard for determining whether or not a tribe or nearby local community will be consulted. That's not the standard of whether or not there will be detriment. It's whether or not they will be consulted. And in making the determination that he had to consult the Pecun tribe, he made the determination that there would be detrimental impact. And what we're saying at this point is, once he made that determination, he had an obligation under the regs and under IGRA to fully explore and fully count the impacts on Pecun. Okay. Thank you. We'll take the matter under submission, take a brief break while we have a big change of chairs.
judges: Garland, Tatel, Edwards